# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

STEVEN R. KEENE,

      Petitioner,

-vs-                                  Case No.   8:18-cv-1767-CEH-JSS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## <u>ORDER</u>

Petitioner, a Florida prisoner, initiated this action by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) challenging convictions for second-degree felony murder and two counts of attempted armed robbery. Respondent filed a response opposing the petition (Doc. 10) to which Petitioner replied (Doc. 14). Upon consideration, the petition will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

Petitioner's friend, Jason Bahamonde (the victim), was shot and killed when he and Petitioner attempted to rob Jeremiah Spell and Mathew Sheaffer during a drug deal (Doc. 12-3, Ex. 8, docket p. 653). Petitioner was charged with second-degree murder and two counts of attempted robbery (Doc. 12-2, Ex. 4, docket pp. 114-15).

1

Petitioner filed a motion to suppress statements he gave to detectives in which he claimed the detectives interrogated him while he was in custody and without providing *Miranda* warnings (Doc. 12-2, Ex. 1, docket pp. 2-9). After a hearing, the motion was denied (Doc. 12-2, Ex. 3).

At the conclusion of his trial, the jury found Petitioner guilty as charged (Doc. 12-3, Ex. 5). He was sentenced to 25 years in prison on the second-degree murder conviction, and to 15 years in prison on each of the attempted robbery convictions, concurrent with each other and the second-degree murder sentence (Doc. 12-3, Ex. 7, docket p. 556). His motion for a new trial (Doc. 12-3, Ex. 6) was denied (Doc. 12-3, Ex. 7, docket p. 530), and his convictions and sentences were affirmed on appeal (Doc. 12-3, Ex. 10).

Petitioner filed a motion under Rule 3.800, Fla.R.Crim.P., in which he argued he should have been sentenced to a maximum of 5 years in prison on the attempted robbery convictions (Doc. 12-3, Ex. 11). The motion was denied and affirmed on appeal. *Keene v. State*, 160 So.3d 427 (Fla. 2D DCA 2015) (Table).

Petitioner filed a motion under Rule 3.850, Fla.R.Crim.P., alleging six grounds of ineffective assistance of trial counsel (Doc. 12-3, Ex. 12). Grounds 1, 2, 3, and 6 were summarily denied (Doc. 12-3, Ex. 13), and Grounds 4 and 5 were denied following an evidentiary hearing (Doc. 12-4, Ex. 15, docket pp. 108-09). The denial of the Rule 3.850 motion was affirmed on appeal (Doc. 12-4, Ex. 16).

Petitioner filed his federal habeas petition in this Court alleging six grounds for relief (Doc. 1).

## II. GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## A. Standard of Review Under the AEDPA

Under the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the

4

habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## B. Standard for Ineffective Assistance of Counsel

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense. *Id*. at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."   *Id*. at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing

> courts to allow lawyers broad discretion to represent their clients by
> pursuing their own strategy. We are not interested in grading lawyers'
> performances; we are interested in whether the adversarial process at
> trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).

Under those rules and presumptions, "the cases in which habeas petitioners can

properly prevail on the ground of ineffective assistance of counsel are few and far

between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## C. Exhaustion of State Remedies and Procedural Default

Before a district court can grant habeas relief to a state prisoner under § 2254,

the petitioner must exhaust all state court remedies that are available for challenging

his conviction, either on direct appeal or in a state post-conviction motion. *See* §

2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner

must give the state courts an opportunity to act on his claims before he presents those

claims to a federal court in a habeas petition."). A state prisoner "'must give the state

courts one full opportunity to resolve any constitutional issues by invoking one

complete round of the State's established appellate review process,' including review

by the state's court of last resort, even if review in that court is discretionary." *Pruitt*

*v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at

845.)

To exhaust a claim, a petitioner must make the state court aware of both the

legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735

(11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its' prisoners federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State...if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). A petitioner may raise a federal claim in state court "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or simply by labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or

the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256

F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a

petitioner "must demonstrate that some objective factor external to the defense

impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.

3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986). To show

prejudice, a petitioner must demonstrate not only that the errors at his trial created

the possibility of prejudice but that they worked to his actual and substantial

disadvantage and infected the entire trial with error of constitutional dimensions.

*United States v. Frady*, 456 U.S. 152 (1982). The petitioner must show at least a

reasonable probability of a different outcome. *Crawford v. Head*, 311 F.3d 1288, 1327-

28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally

defaulted claim if review is necessary to correct a fundamental miscarriage of justice.

*Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier*, 477 U.S. at 495-96. A

fundamental miscarriage of justice occurs in an extraordinary case where a

constitutional violation has probably resulted in the conviction of someone who is

actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "'[A]ctual innocence'

means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523

U.S. 614, 623 (1998). To meet this standard, a petitioner must show a reasonable

likelihood of acquittal absent the constitutional error. *Schlup*, 513 U.S. at 327.

## III. ANALYSIS

**Ground 1: The Petitioner was denied Due Process of law under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution when the trial court denied petitioners [sic] motion to suppress statements. (Doc. 1, p. 3)**

Petitioner contends his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when the state trial court denied his motion to suppress the statements he made to police on February 28, 2011, and March 8, 2011. He argues the statements should have been suppressed because he gave them while in custody and without *Miranda* warnings.[1]

Petitioner raised the denial of his motion to suppress his statements on direct appeal (Doc. 12-3, Ex. 8, docket pp. 656-70). The state appellate court's unelaborated decision (*see* Doc. 12-3, Ex. 10) warrants deference under Section 2254(d)(1) as an adjudication of Petitioner's ground on the merits.

*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). To determine whether a person is in custody, a court examines all of the circumstances surrounding the interrogation. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). Determining whether a suspect is "in custody" requires two discrete inquiries: "[F]irst, what were the circumstances

---

1 *See Miranda v. Arizona*, 384 U.S. 436, 478 (holding that "a person [in custody] must be warned [before interrogation] that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed.").

surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (internal footnote omitted). Relevant factors include the location of the questioning, *see Maryland v. Shatzer*, 559 U.S. 98, 110–17 (2012), the duration of questioning, *see Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984), statements made during the interview, *see Mathiason*, 429 U.S. at 495; *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *Stansbury*, 511 U.S. at 325, the presence or absence of physical restraints during questioning, *see New York v. Quarles*, 467 U.S. 649, 655 (1984), and the release of the person at the end of questioning, *see California v. Beheler*, 463 U.S. 1121, 1122–23 (1983) (*per curiam*).[2]

After a hearing, the trial court denied the motion to suppress as follows:

## FACTUAL BACKGROUND

On February 26, 2011, the victim, Jason Bahamonde, was shot multiple times. Law enforcement obtained information that the Defendant, Steven Keene, may have been a witness or present at the shooting. On February 28, 2011, Deputy Woolley and several other law enforcement officers from the Hillsborough County Sheriff's Office went to the Defendant's residence. When Deputy Woolley made contact with the Defendant, he handcuffed the Defendant and called Detective Schramm who was investigating the case along with Detective Morgan. Detective Schramm advised Deputy Woolley that the Defendant was just a witness to his case and to uncuff him. Deputy Woolley then removed the handcuffs and advised the Defendant that he was not under arrest. Deputy Woolley then apologized to the Defendant for the misunderstanding and explained to him that Detective Schramm merely wanted to obtain a statement from him relating to the events surrounding his friend's murder. The Defendant

---

2 These precedents are collected in *Howes v. Fields*, 565 U.S. 499, 509 (2012).

stated that he had tried to speak to officers of the Tampa Police Department the night of the shooting, but that they refused to listen to him, stating that the case belonged to the Hillsborough County Sheriff's Office. Deputy Woolley told the Defendant that he could wait at his apartment for Detective Schramm to arrive for the interview or that he could drive the Defendant to the Criminal Investigations Division. Deputy Woolley suggested to the Defendant that it would be quicker if he drove him to the Criminal Investigations Division. As a result, the Defendant agreed to allow Deputy Woolley to take him to the Criminal Investigations Division for the interview. During the ride to the interview, the Defendant was placed in the back of Deputy Woolley's vehicle without handcuffs. Deputy Woolley stopped by a McDonald's on the way so that the Defendant could get something to eat. During the drive, Deputy Woolley and the Defendant had a lengthy conversation about the Defendant's children, his deceased friend, his soon to be ex-wife, and the martial arts. The Defendant also expressed his desire to catch the person responsible for his friend's death. The conversation during the drive was friendly.

When the Defendant arrived at the Criminal Investigations Division, the Defendant was advised that he could smoke and stretch his legs as he was not under arrest. According to the testimony of Detective Schramm, the Defendant's attitude prior to the interview was cooperative. Detective Schramm testified that the Defendant told him that he wanted to assist law enforcement in catching the person who shot his friend. The Defendant was then escorted to an interview room where he gave a lengthy statement of the events surrounding his friend's death (both Detective Schramm and Detective Morgan participated in this initial interview). Immediately preceding this interview, the Defendant was advised he was not under arrest but that law enforcement wanted to "get to the bottom" of the shooting. The Defendant related that he did not do anything wrong and had nothing to hide. The Defendant once again expressed his frustration that the Tampa Police Department would not help him when his friend was dead. After the interview concluded, the Defendant was then taken back to his apartment by Detective Woolley.

On March 8, 2011, a second statement was taken from the Defendant by Detective Schramm. Detective Schramm contacted the Defendant and asked him to come to the Criminal Investigations Division for a second statement. The Defendant agreed and had a

friend drive him to the police station. Again, prior to the interview, Detective Schramm advised the Defendant that he was not under arrest and that he could leave the interview at any time. During this interview, Detective Schramm confronted the Defendant with some inconsistencies and also asked the Defendant some questions for clarification. After the interview was completed, the Defendant was allowed to leave the police station.

## LEGAL ANALYSIS

When determining if a Defendant is in custody for purposes of Miranda, the ultimate inquiry is whether "a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest." *Ramirez v. State*, 739 So. 2d at 568, 573 (Fla. 1999). In *Ramirez*, the Florida Supreme Court set out four factors as a guide for determining whether a suspect is in custody for purposes of *Miranda*. Under the *Ramirez* test, the determination of whether a reasonable person in the suspect's position would consider himself to be in custody requires consideration of: "(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extend [sic] to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning." In order for a court to conclude that a suspect was in custody, it must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police." *State of Florida v. Pitts*, 936 So. 2d 1111 (2nd DCA 2006), *citing Connor*, 803 So. 2d at 605.

### (a) The Manner in Which the Suspect was Summoned for Questioning

In the instant case, while it is true that prior to the February 28, 2011 interview, the Defendant was originally handcuffed by Deputy Woolley; this incident was minor and immediately corrected once Detective Schramm was contacted. Additionally, even though the Defendant was transported by law enforcement to this interview, the Defendant was given the option of waiting at his apartment for Detective Schramm to arrive and obtain the statement. The Defendant

was also advised by Deputy Woolley that he was not under arrest, was just a witness, and that law enforcement merely desired to interview him. Detectives Schramm and Morgan also advised the Defendant at the interview that he was not under arrest and the Defendant was allowed to leave after his statement was obtained. More importantly, the Defendant expressed on more than one occasion this night, his desire to speak with law enforcement regarding his friend's death.

With respect to the March 8, 2011 interview, the Defendant had a friend drive him to the police station for a second interview at the request of Detective Schramm. There are no circumstances surrounding this interview to suggest that the Defendant felt compelled to submit to this interview. [FN 2] Additionally, prior to the interview, Detective Schramm again advised the Defendant that he was not under arrest and he was free to leave at any time.

On both occasions, the Defendant's statement was taken at the Criminal Investigation Division. Although the Defendant was transported to the police station by a deputy for the February 28, 2011 interview, the circumstances surrounding the Defendant's transport do not suggest that he would have reason to believe he was in custody as he was specifically informed that he was just a witness, he was not physically restrained while in the police car, and he was allowed to smoke and eat during the drive. [FN 3] While the arrival of several uniformed officers at the Defendant's residence late at night may suggest the urgency of their desire to speak with him, this fact does not, in and of itself, leave an impression that the Defendant's freedom was being restrained. Moreover, considering the fact that the shooting had just happened a day before, the timing of the request for this first interview would not lead a reasonable person to believe that he had no choice but to accompany the officers.

**(b) The Purpose, Place, and Manner of the Interrogation**

Again, both interviews were conducted at the Criminal Investigations Division. Although the location of these interviews is a circumstance consistent with custodial interrogation, this factor alone, is not determinative of whether or not a reasonable person would believe they are in custody.

The purpose of the first interview was to obtain a statement from the Defendant as he was identified as a possible witness to his friend's death. Again, it is noteworthy that the Defendant was not at all surprised by law enforcement's request to obtain a statement from him. On the contrary, the Defendant on several occasions expressed his frustration that the Tampa Police Department would not help in his friend's death and that he just wanted to "catch the shooter" that killed his friend. The Defendant also stated during his first interview that he did nothing wrong and had nothing to hide.

With respect to the March 8, 2011 interview, Detective Schramm clearly advises the Defendant prior to the interview that he wanted to obtain a second statement to clarify some things. Additionally, Detective Schramm advised the Defendant that he was not under arrest and that he could terminate the interview at any time.

As to the manner of both interrogations, the audio/video recording make it clear that the officers did not in any way force or coerce the Defendant to make either statement. When both statements were made, he was not handcuffed or threatened in any way. The officers' tone was pleasant and they did not raise their voices or otherwise speak to the Defendant in an intimidating manner. While it is true that the Defendant is confronted with inconsistencies in his statements, the general atmosphere of both interviews reflect that such were taken in a conversational manner.


**(c) The Extent to Which the Suspect if [sic] Confronted with Evidence of his or her Guilt**

As noted above, both interviews were conducted in a conversational manner. Again, although the Defendant was confronted with inconsistencies in his statements at some points in the interview, at no time did the officers ever demand that the Defendant admit his guilt.

**(d) Whether the Suspect is informed That He or She is Free to Leave**

Prior to both interviews, the Defendant was told multiple times that he was not under arrest and was free to leave. Specifically, on the

night of the February 28, 2011 interview, the Defendant was told by Deputy Woolley that he was not under arrest and that law enforcement merely wanted to obtain a statement from him. The Defendant voluntarily made the choice to have Deputy Woolley transport him to the Criminal Investigations Division rather than wait at his apartment for Detective Schramm. Once the Defendant arrived at the police station, he was told by Deputy Woolley that he was free to smoke and stretch his legs as he was not under arrest. Prior to this interview, Detective Morgan advises the Defendant that she appreciates him coming down to the police station on his own accord and that he is not under arrest. The Defendant replies that he attempted to get the Tampa Police Department involved in investigation [sic] his friend's death and that they refused to do so. This response certainly implies that the Defendant is more than willing at this time to give a statement to law enforcement.

Similarly, the Defendant was clearly advised by Detective Schramm on the March 8, 2011 interview that he was not under arrest but that the Detective wanted to get a second statement to clarify things. Prior to this interview, Detective Schramm also advised the Defendant that he could terminate the interview at any time.

## Conclusion

None of the circumstances of either interview are sufficient, either individually or collectively, to establish that the Defendant would have any reason to believe that his freedom of action was curtailed to a degree associated with actual arrest. As a result the Court hereby **DENIES** the Defendant's Motion to Suppress.

[FN 2] Although the Defendant testified during the hearing that he felt pressured to attend this second interview, the Court does not find his testimony to be credible.

[FN 3] The Court also notes the friendly conversation that took place between the Defendant and Deputy Woolley during the drive to the police station. This conversation certainly does not suggest in any way that the Defendant was being forced to go to the Criminal Investigations Division. As a matter of fact, during the drive, the Defendant expresses his desire to "catch the shooter".

(Doc. 12-2, Ex. 3).

The state trial court's factual findings are supported by the record. Deputy Woolley testified that on February 28, 2011, he and other deputies responded to a call (noise disturbance) at the apartment complex where Petitioner lived (Doc. 12-2, Ex. 2, docket pp. 17-18). While at the complex, Deputy Woolley was informed that Petitioner was a "person of interest" in a homicide (*Id.*, docket p. 18). Deputy Woolley and two other deputies knocked on Petitioner's door while two other deputies went to the rear of the apartment (*Id.*, docket p. 19). When Petitioner opened the door, Deputy Woolley said, "Hello Mr. Keene, nice to see you," then placed him in handcuffs as a precaution because he did not know what Petitioner's role was with respect to the homicide (*Id.*, docket pp. 19, 33). Petitioner informed Deputy Woolley that earlier he had spoken to Detective Schramm (*Id.*, docket p. 20). Deputy Woolley contacted Detective Schramm who directed him to remove the handcuffs from Petitioner because he was only a witness to the homicide (*Id.*, docket p. 21). Deputy Woolley removed the handcuffs and apologized to Petitioner (*Id.*, docket p. 22). Petitioner was handcuffed approximately five to ten minutes (*Id.*).

After Deputy Woolley told Petitioner the detectives wished to speak to him, Petitioner implied that he wanted to speak to the detectives (*Id.*). Deputy Woolley then offered to take Petitioner to the Criminal Investigations Division (CID) to meet with the detectives, rather than to wait for them to come to his apartment, then

return Petitioner when he was finished (*Id.*, docket p. 23). Petitioner said he wanted to go to speak to the detectives (*Id.*, docket pp. 23-24).

After Petitioner and Deputy Woolley searched for Petitioner's medicine, Petitioner went into the back of Deputy Woolley's patrol car (*Id.*, docket p. 24). During the drive, he was not handcuffed, was allowed to smoke a cigarette in the car, was talkative and pleasant, and had a conversation about his children with Deputy Woolley (*Id.*, docket pp. 24-27). They even stopped at McDonald's to get Petitioner something to eat before arriving at the CID (*Id.*).

When they arrived at the CID, Deputy Woolley told Petitioner that he was free to walk around because he was just a witness (*Id.*, docket p. 28). After the interview Deputy Woolley returned Petitioner to his apartment (*Id.*, docket p. 29).

Detective Schramm testified he first saw Petitioner at the CID at 1:00 a.m. on February 28 (*Id.*, docket p. 39). At that time, he had little information regarding Petitioner's role in the homicide (*Id.*, docket pp. 39-40). He had learned from Petitioner's girlfriend, who was in jail with the victim's girlfriend, that Petitioner was with the victim at the time of the homicide (*Id.*, docket p. 44).

During the interview Petitioner was seated in a chair furthest from the door in the interview room (*Id.*, docket p. 53). He was very cooperative and stated he wanted to tell his version of the events and help catch the person who shot his friend (*Id.*, docket p. 45). Petitioner and the detectives talked calmly, and the detectives never

17

threatened or promised anything to Petitioner (*Id.*, docket p. 46). Petitioner was allowed to keep his possessions and drink during the interview and never asked to leave (*Id.*, docket p. 47). The detectives were seeking information because they did not know Petitioner's role in the homicide (*Id.*).

After consulting with the State's Attorney Office, Detective Schramm again interviewed Petitioner on the afternoon of March 8, 2011 (*Id.*, docket pp. 48-49). Detective Schramm believed there was probable cause to arrest Petitioner, but the State Attorney believed it would be best to interview Petitioner again (*Id.*, docket pp. 56-57). Detective Schramm called Petitioner and asked him if he would come to the CID to talk more about the case (*Id.*, docket p. 49). Petitioner agreed and was taken there by a friend (*Id.*). When Petitioner arrived, Detective Schramm told him he was not under arrest and was free to leave at any time (*Id.*). Petitioner was never told he could not leave, and he never asked to leave (*Id.*). The conversation was calm during the interview (*Id.*). Petitioner was not handcuffed, and his movement was not restricted (*Id.*, docket p. 50). Detective Schramm did not sit in front of the door of the room during the interview (*Id.*, docket p. 53). The interview lasted approximately 45 minutes (*Id.*, docket p. 58).

Detective Morgan testified she was the lead detective in Petitioner's case (*Id.*, docket p. 60). She first came in contact with Petitioner during the February 28 interview (*Id.*). Before the interview she learned from both Petitioner's girlfriend and

the victim's girlfriend that Petitioner was present at the time the victim was killed (*Id.*, docket p. 62). During the interview Petitioner was calm and cooperative, informed the detectives the victim was his friend, and stated he wanted to help the deputies (*Id.*, docket pp. 60-61). In fact, he told the detectives he previously attempted to tell two other officers about what happened (*Id.*, docket p. 67).

Detective Morgan told Petitioner she appreciated him coming to speak with them, and he "was there on his own accord." (*Id.*). The deputies were calm and respectful toward Petitioner during the interview (*Id.*). They took two breaks during the interview, never threatened Petitioner nor promised him anything, and never restrained him (*Id.*, docket pp. 64, 67).

Detective Morgan was out on vacation at the time of the March 8 interview (*Id.*, docket p. 68). Before that interview she did not believe there was probable cause to arrest Petitioner (*Id.*, docket p. 73).

Petitioner testified he opened the door to his apartment, and the deputy "really didn't say nothing" and handcuffed him (*Id.*, docket p. 77). He asked the deputy why he was being handcuffed, and the deputy responded, "you're in trouble." (*Id.*). He was handcuffed approximately fifteen minutes before the handcuffs were removed, and the deputy apologized to him after speaking to the detective (*Id.*, docket pp. 77-78).

The deputy told Petitioner it would be in his best interest to talk to the detective (*Id.*, docket p. 78). He did not want to argue with the deputy and believed he had no choice but to go to the CID because he did not think he could tell all the deputies to leave his apartment (*Id.*). Petitioner admitted, however, that the victim was his best friend, he previously attempted to talk to officers to tell them what happened, and he wanted to help law enforcement catch the person who shot the victim (*Id.*, docket pp. 84-85).

The deputy took Petitioner in his patrol car to the CID (*Id.*, docket p. 79). When he arrived, he told the detectives he wanted "to get this over with because [he] really want[ed] to catch the shooter." (*Id.*, docket p. 87). He was escorted into the building by a male detective and a female detective (*Id.*, docket p. 79). He believed he had to go with them and was not free to leave because he thought "it would be best to talk to them" and "had to talk to them." (*Id.*, docket pp. 79-80). Moreover, he asked whether he needed an attorney, and Detective Schramm said, "you don't need one." (*Id.*, docket p. 84).

During the interview Detective Schramm was sitting "kind of parallel with" the door to the interview room (*Id.*, docket p. 80). In Petitioner's opinion Detective Schramm was blocking the door (*Id.*). Petitioner believed he could not leave the interview room (*Id.*). After the interview, an officer drove Petitioner back to his apartment (*Id.*, docket p. 80).

On March 8, 2011, Detective Schramm called Petitioner to ask if he would give another statement (*Id*.). Petitioner did not really believe he could refuse to go speak with Detective Schramm because the detective told him it would help solve the case and was in his best interest to talk to him, and he already knew where Petitioner lived (*Id*., docket p. 81). Petitioner contacted a friend who drove him to the CID to meet with Detective Schramm (*Id*., docket pp. 87-88).

During the interview Petitioner did not believe he was free to get up and leave because Detective Schramm was "pretty intimidating. . . pretty much screaming, I know you did things wrong here." (*Id*., docket p. 82). In the middle of the interview, Petitioner told Detective Schramm that he did not want to talk anymore because he "was getting tired [and] was ready to go home." (*Id*., docket p. 86). After the interview Detective Schramm thanked Petitioner for cooperating and told him he could leave (*Id*., docket p. 82). Petitioner, however, was arrested later that day (*Id*.).

The record supports the conclusion Petitioner was not in custody for purposes of *Miranda* when he gave his statements to the detectives on February 28, 2011, and March 8, 2011. Although both interviews were at the CID, Petitioner voluntarily agreed on both occasions to go there to discuss the case. On February 28, he chose to go to the CID rather than to wait for the detectives to come to his apartment. And when Detective Schramm called and asked him to come to the CID on March 8, he agreed and arranged for a friend to drive him there.

Neither interview was particularly long. Although the February 28 interview lasted from either two to four hours, Petitioner took two breaks during the interview to smoke and drink coffee (Doc. 12-2, Ex. 4, docket p. 818; Doc. 12-3, Ex. 4, docket p. 206). And the March 8 interview lasted 45 minutes (Doc. 12-2, Ex. 2, docket p. 58). After both interviews Petitioner was released to return to his apartment, and law enforcement drove him back to his apartment after the February 28 interview.

Petitioner was not handcuffed or otherwise restrained during either interview or when he was riding in Deputy Woolley's patrol car to the initial interview. Although he was handcuffed for 10 to 15 minutes when the deputies first arrived at his apartment, the handcuffs were removed after Deputy Woolley learned from Detective Schramm that Petitioner was not a suspect, and Deputy Woolley apologized to Petitioner. And Petitioner's testimony that he believed he could not leave the interview room because "in his opinion" Detective Schramm was blocking the door is supported solely by his vague testimony that Detective Schramm was sitting "kind of parallel with" the door. Detective Schramm testified he did not sit in front of the door during the interviews.

Petitioner testified during the hearing he "believed" he had to go to the CID to talk to the detectives and was not free to leave the interviews. His subjective beliefs, however, are not relevant in determining whether he was in custody. "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74

F.3d 1117, 1119 (11th Cir.1996). Petitioner never testified anyone told him he was required to go to the CID to speak to the detectives. At worst, he testified Deputy Woolley and Detective Schramm told him it was in his best interest to talk (Doc. 12-2, Ex. 2, docket pp. 78, 88). And he conceded that while at the CID, the detectives told him he was not under arrest and was free to leave at any time (*Id.*, docket p. 89). This is an important factor in determining Petitioner was not in custody. *See United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) ("[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave.").

Another factor weighing heavily in favor of finding Petitioner was not in custody is his desire to assist the detectives in finding the "shooter" because the victim was his best friend (*Id.*, docket p. 84). Petitioner admitted when he was contacted by the detectives, he wanted to help them (*Id.*, docket pp. 84-85). He even stated that before he was contacted, he attempted to contact the police department to let them know what had happened (*Id.*, docket p. 84).

Under the totality of the circumstances, the Court finds Petitioner was not in custody within the meaning of *Miranda* when he was interviewed on February 28, 2011, and March 8, 2011. Accordingly, the state appellate court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law. Ground 1 therefore warrants no relief.

**Ground 2: The Petitioner was denied Due Process of law under the Fifth and Fourteenth Amendments of the United States Constitution when the states [sic] argument against granting the petitioners [sic] motion to suppress included perjured testimony by detectives Morgan and Shramm [sic] of which the state knew, or should have known, constitutes a violation of Giglio and its progeny.**

Petitioner contends the State violated *Giglio v. United States*, 405 U.S. 150 (1972) during the hearing on his motion to suppress when Detectives Morgan and Schramm falsely testified concerning the number of recorded telephone calls, between Petitioner and his girlfriend Jennifer Perdomo, they listened to before interviewing him on February 28, 2011. Specifically, Petitioner alleges the detectives testified they listened to only two calls before the February 28, 2011 interview, whereas the recording of the February 28 interview reveals Detective Schramm stated he listened to three or four calls before the interview, and Detective Morgan stated she listened to multiple calls before the interview. Petitioner further alleges that Detective Morgan falsely testified she learned information implicating him in criminal activity only after listening to more phone calls after the second (March 8) interview. He states the recording of the first interview shows she knew this information before that interview.

Petitioner argues these false statements lead the trial court to believe the detectives had no prior knowledge of his role in the homicide when the record shows prior to the first and second interviews, the detectives knew he was a suspect, and with that knowledge, knowingly elicited incriminating responses from him. He further argues but for these false statements, the trial court would have granted his

motion to suppress, and without Petitioner's statements there is a reasonable

likelihood the result of the trial would have been different.

This claim was raised in state court in Ground 3 of Petitioner's Rule 3.850

motion (Doc. 12-3, Ex. 12, docket pp. 721-24). In denying the claim, the state post-

conviction court stated:

> In claim three, Defendant alleges the State presented perjured testimony from Detectives Morgan and Schramm during the motion to suppress hearing where the State knew, or should have known, was in violation of *Giglio*. Specifically, he alleges the State's argument to deny the motion to suppress contained perjured testimony by Detectives Morgan and Schramm which the State knew or should have known was false. He alleges at the August 19, 2011, suppression hearing, Detective Schramm testified he listened to two phone calls between Defendant and Ms. Perdomo prior to conducting the first interview of Defendant. He alleges Detective Schramm's testimony at the suppression hearing was false because during the tape of the first interview, Detective Schramm told Defendant he had just got done listening to three or four phone calls between Defendant and Ms. Perdomo and those calls lasted an hour and a half to two hours. He alleges Detective Schramm admitted to knowing that Defendant and the victim were planning a "lick" based on the phone calls Detective Schramm had listened to prior to the first interview.

> He further alleges Detective Morgan testified at the suppression hearing that she only listened to two phone calls between Defendant and Ms. Perdomo when the tape of the first interview reflects she told Defendant she had listened to multiple calls between him and Ms. Perdomo where he talked to her at length about what happened. He alleges Detective Morgan then testified that she pulled additional calls after Defendant was arrested which referred to a "lick." However, he alleges on the tape of the first interview, Detective Morgan told Defendant they knew about the "lick." He alleges that information came before the first interview and not after Defendant's March 8, 2011, arrest. He alleges Detective Morgan falsely stated that she pulled calls making her aware of the "lick" and other incriminating facts on March 9, 2011.

25

He alleges Detective Morgan and Schramm made false statements during the suppression hearing, thereby leading the Court to believe they had no prior knowledge of Defendant's activities when the record shows that prior to the first and second interviews, they knew Defendant was a suspect and with that knowledge, they knowingly elicited incriminating responses or should have known their remarks to Defendant regarding what they already knew were reasonably likely to elicit an incriminating response. He alleges but for their false statements, the Court would not have denied the motion to suppress. He alleges the State knew or should have known that Detectives Morgan and Schramm's testimony was false and the State failed to correct it. He alleges had the Court not been led to believe that the information used to elicit incriminating responses from Defendant was not known prior to the detectives' interviews of Defendant rather than after he was arrested, there is a reasonable likelihood the false testimony could have affected the Court's judgment. He alleges with Defendant's statements suppressed, the State would not have had their primary incriminating source of evidence to convince the jury to convict Defendant.

After reviewing the allegations, the court files, and the record, the Court finds Defendant's allegations are facially sufficient. However, the Court finds "[a] *Giglio* violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." *Davis*, 26 So. 3d 519, 532 (Fla. 2009); *see also Guzman v. State*, 941 So.2d 1045, 1050 (Fla.2006). "Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict." *Davis*, 26 So. 3d at 532; *see also Guzman*, 941 So. 2d at 1050-51. "Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt." *Davis*, 26 So. 3d at 532; *see also Guzman*, 941 So. 2d at 1050.

With respect to Defendant's claim that Detective Schramm's testimony at the suppression hearing that he listened to two phone calls prior to the first interview was false because Detective Schramm told him at the first interview that he just got done listening to three or four phone calls between Defendant and Ms. Perdomo, the Court finds the recording of the first interview was played for the jury during the trial.

(*See* trial transcript, pps. 714-851, attached). The Court finds during the first interview, Detective Schramm stated the following:

> SCHRAMM: Why would you lie about not talking to her?

> DEFENDANT: What are you talking about lying about not talking to her?

> SCHRAMM: You talked to her three or four times that night. We have it recorded on jail calls. Steven - -

> DEFENDANT: I might have talked to her.

> SCHRAMM: Listen to me.

> DEFENDANT: She calls - - she calls several times, but - - because Jason's girlfriend's in the same pod with her and - -

> SCHRAMM: She called you three or four times. I just got done listening to the phone calls.

> DEFENDANT: Okay.

(*See* trial transcript, pps. 784-785, attached).

The Court finds at the August 19, 2011, motion to suppress hearing, Detective Schramm did testify that he listened to two phone calls. (*See* August 19, 2011, transcript, p. 59, attached). Therefore, the Court finds Detective Schramm did testify during the motion to suppress hearing that he listened to two phone calls prior to the first interview, but at trial, he testified he just got done listening to the phone calls after referencing three or [sic] phone calls being made. The Court is unable to determine from the record whether the State knew Detective Schramm's testimony at the suppression hearing was inconsistent. However, the Court finds Detective Schramm's testimony that he listened to two calls before the first interview was not material to the Court's ruling on the motion to suppress as the Court never makes any reference in its August 22, 2011, order of the number of recorded jail calls Detective Schramm listened to prior to the first interview. (*See* August 22, 2011, order, attached). Specifically, the Court denied the motion to suppress finding that none of the circumstances of either

interview were sufficient, either individually or collectively, to establish that Defendant would have any reason to believe that his freedom of action was curtailed to a degree associated with actual arrest. (*See* August 22, 2011, order, attached). Therefore, the Court finds no *Giglio* violation occurred. **As such, no relief is warranted upon this portion of claim three.**

With respect to Defendant's claim that Detective Morgan testified at the suppression hearing that she only listened to two phone calls between Defendant and Ms. Perdomo when the tape of the first interview reflects she told Defendant she had listened to multiple calls between him and Ms. Perdomo where he talked to her at length about what happened, the Court finds the recording of the first interview was played for the jury during the trial. (*See* trial transcript, pps. 714-851, attached). The Court finds during the first interview, Detective Morgan stated, "[a]fter the shooting happened, not an hour later within that hour, you're on the phone with Jennifer multiple times talking to her at length about what happened." (*See* trial transcript, p. 786, attached).

The Court finds at the August 19, 2011, motion to suppress hearing, Detective Morgan did testify that she "listened to the jail calls." (*See* August 19, 2011, transcript, p. 52, attached). The Court finds she also testified, "[t]he jail calls that I listened to at that time occurred after the incident." (*See* August 19, 2011, transcript, p. 53, attached). The Court finds she also admitted to pulling more than two calls. (*See* August 19, 2011, transcript, pps. 55-56, attached). Therefore, the Court finds Detective Morgan did testify during the motion to suppress hearing that she listened to jail phone calls prior to the first interview, and at trial, she testified she listened to the jail calls. The Court finds Detective Morgan referred to "jail calls" during the motion to suppress hearing and admitted to pulling more than two calls. Therefore, the Court finds Detective Morgan's testimony was consistent at both the motion to suppress hearing and during the trial.

The Court further finds even if the Court were to find Detective Morgan's testimony at the suppression hearing was false, Detective Morgan's testimony regarding the number of calls she listened to before the first interview was not material to the Court's ruling on the motion to suppress as the Court never makes any reference in its August 22, 2011, order to the number of recorded jail calls Detective Morgan listened to prior to the first interview. (*See* August 22, 2011, order,

attached). Specifically, the Court denied the motion to suppress finding
that none of the circumstances of either interview were sufficient, either
individually or collectively, to establish that Defendant would have any
reason to believe that his freedom of action was curtailed to a degree
associated with actual arrest. (*See* August 22, 2011, order, attached).
Therefore, the Court finds no *Giglio* violation occurred. **As such, no
relief is warranted upon this portion of claim three**.

(Doc. 12-3, Ex. 13, docket pp. 748-52) (emphasis and alterations in original).

The record supports the rejection of this claim. "To make out a valid *Giglio*

claim, a petitioner 'must establish that (1) the prosecutor knowingly used perjured

testimony or failed to correct what he subsequently learned was false testimony; and

(2) such use was material, i.e., that there is any reasonable likelihood that the false

testimony could have affected the judgment.'" *Ferguson v. Sec'y, Dep't of Corr.*, 580

F.3d 1183, 1208 (11th Cir. 2009) (quoting *Davis v. Terry*, 465 F.3d 1249, 1253 (11th

Cir. 2006)). "In the *Giglio* context, the suggestion that a statement may have been

false is simply insufficient; the defendant must *conclusively show* that the statement

was actually false." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir.

2005) (citing *Moon v. Head*, 285 F.3d 1301, 1315 (11th Cir.2002); *Brown v. Head*, 272

F.3d 1308, 1317–18 (11th Cir.2001) (emphasis added)).

Petitioner has not conclusively shown that either Detective Schramm or

Detective Morgan testified falsely during the hearing on the motion to suppress.

First, despite Petitioner's allegation to the contrary, during the February 28, 2011

interview, Detective Morgan did not say she listened to "multiple calls." Rather, she

stated, in pertinent part, "[a]fter the shooting happened, not an hour later within that

29

hour, you're on the phone with Jennifer multiple times talking to her at length about what happened." (Doc. 12-3, Ex. 4, docket p. 76). Because Detective Morgan *knew* Petitioner spoke to Perdomo "multiple times" does not establish that she *listened* to more than two calls before the February 28, 2011 interview. Second, Petitioner incorrectly alleges that during the hearing on the motion to suppress, Detective Schramm testified he listened to only two phone calls. It was Detective Morgan who testified she listened to two phone calls (Doc. 12-2, Ex. 2, docket p. 69).[3] Third and finally, although Detective Morgan testified she listened to additional recorded calls on March 9 in which Petitioner stated he and the victim were planning a "lick" (robbery) (Doc. 12-2, Ex. 2, docket p. 66), she also testified the two recorded calls she listened to before the February 28 interview revealed Petitioner made inconsistent statements and talked about setting up a drug deal, and led Detective Morgan to believe Petitioner was involved in the homicide (*Id.*, docket p. 69).

Even assuming Petitioner has shown the detectives' testimony was untruthful, he fails to show materiality. He argues the testimony was material because it gave the trial court the impression the detectives had no prior knowledge of Petitioner's

---

3 In finding "Detective Schramm did testify [during the hearing on Petitioner's motion to suppress] that he listened to two phone calls[,]" the state post-conviction court cited page 59 of the transcript of the hearing (Doc. 12-3, Ex. 13, transcript p. 750). That page includes the testimony of Detective Morgan, not Detective Schramm (Doc. 12-2, Ex. 2, docket p. 69). Detective Schramm never testified during the hearing he listened to only two calls (*Id.*, docket pp. 38-59). Accordingly, the state post-conviction court mistakenly found Detective Schramm testified he listened to two phone calls.

activities at the time of the homicide, and but for this testimony the trial court would have granted the motion to suppress.

Petitioner does not show any reasonable likelihood that the testimony in question affected the decision on the motion to suppress. The detectives' testimony that before the February 28 interview they listened to recorded calls that revealed Petitioner was planning a drug deal and possibly involved somehow in the homicide alerted the trial court to what the detectives knew and suspected before the February 28 interview.[4]

Petitioner fails to show the detectives' testimony was false and material. He therefore fails to establish a *Giglio* violation. Accordingly, the state courts' denial of this claim was not an unreasonable application of established federal law. Ground 2 therefore warrants no relief.

**Ground 3: The Petitioner was denied Due Process of law under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution when the trial court erred in denying the petitioners [sic] motion for mistrial and motion for new trial.**

**Ground 6: The Petitioner was denied Due Process of law under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution when the trial court erred in admitting the petitioners [sic] out of court statements and denying the admission of the entire statement.**

---

4 The Court notes that a "[p]olice officer's subjective view that individual under questioning is a suspect, if undisclosed, does not bear upon question whether individual is in custody for purposes of *Miranda.*" *Stansbury v. California*, 511 U.S. 318 (1994).

In Ground 3, Petitioner contends his right to due process under the Fifth, Sixth, and Fourteenth Amendments was violated when the trial court denied his motion for mistrial and motion for new trial. The motions should have been granted, he argues, because his trial was rendered unfair when the trial court allowed Detective Schramm to testify that the court had denied Petitioner's motion to suppress and found Petitioner was not in custody during the two interviews. Petitioner argues the testimony improperly bolstered the credibility of Detective Schramm because it showed the trial court approved of his interrogation methods and the "product" of the interrogation: Petitioner's admissions.

In Ground 6, Petitioner contends his right to due process under the Fifth, Sixth, and Fourteenth Amendments was violated when the trial court admitted portions of, but not all of, the recorded calls between Petitioner and Perdomo. He argues the omitted portions of the calls were exculpatory and therefore the entirety of the calls should have been admitted under Florida's "Rule of Completeness," Section 90.108(1), Fla. Stat.

Respondent argues these claims are procedurally barred from federal review because they were never presented as federal claims to the state courts. Rather, Respondent asserts, Petitioner "argued only state law as a basis for finding the state trial court erred when denying his motions for mistrial and new trial[,]. . .[and] his request to admit the entire statements pursuant to section 90.108(1), Florida Statutes." (Doc. 10, docket pp. 19, 28). The Court agrees.

Although on direct appeal Petitioner challenged the trial court's denial of his motions for mistrial and new trial (Doc. 12-3, Ex. 8, docket pp. 672-77), and denial of his request to introduce the entirety of the recorded calls (*id.*, docket pp. 670-72), he made no reference to a federal, constitutional violation of due process. Consequently, the state appellate court was never notified of any federal constitutional claim in Petitioner's direct appeal. Petitioner therefore failed to exhaust these federal claims in state court. *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015) ("The crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a federal claim.").

Petitioner argues he exhausted federal claims in state court because his Initial Brief cited state law cases "that relied on federal principles of law" and "relie[d] on authorities that have established principles of law as set forth by the US Supreme Court." (Doc. 14, pp. 10, 13). Although some of the Florida cases, *Mason v. State*, 719 So.2d 304 (Fla. 4th DCA 1998), and *Martinez v. State*, 761 So.2d 1074 (Fla. 2000), cited federal cases, neither decided the claim on federal grounds. *See Baldwin,* 541 U.S. at 32 (A petitioner may raise a federal claim in state court "by citing. . .a case *deciding* such claim on federal grounds. . . .") (emphasis added). In *Mason*, the claim was decided on state law, specifically, Florida Statutes, §§ 90.108(1), and 924.051(7). *Id.*, at 305. Although the court cited *Chapman v. California*, 386 U.S. 18 (1967), it did so only to distinguish the holding in *Chapman* -- that "the burden of demonstrating

33

that an error is prejudicial cannot constitutionally be placed on the defendant in a criminal case, if the error is of a constitutional nature" -- from Mason's case where the error was not constitutional and therefore governed by 924.051(7) (which places the burden to show prejudicial error on the defendant). *Id.*, at 305-06. And to the extent *In re Winship*, 397 U.S. 358, 364 (1970) was cited, *id.*, at 306, *Mason* was not decided on *In re Winship*'s holding "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." The issue in *Mason* was not whether the State failed to prove every fact necessary to constitute the crime.

*Martinez* cited to several state cases, state statutes, and two federal cases, *United States v. Young*, 470 U.S. 1 (1985), and *Berger v. United States*, 295 U.S. 78 (1935), in deciding that admission of the investigating officer's opinion testimony as to Martinez's guilt was reversible error. *Martinez*, 761 So. 2d at 1079-81. State cases and state statutes were cited to explain "the basic proposition that a witness's opinion as to the guilt or innocence of the accused is not admissible," and state cases were cited to support the finding that the officer's opinion testimony was not harmless. *Young* and *Berger*, and a state case, were cited to explain that opinion testimony or statements as to the guilt or innocence of the defendant may be exacerbated where the witness is a government representative such as a prosecutor or police officer. *Id.*, at 1080. There was no analysis that an opinion as to the guilt of a defendant violates due process under federal law. It therefore cannot be said that *Martinez* was decided

on federal constitutional grounds.

In this Circuit, exhaustion of a federal claim for purposes of 28 U.S.C. § 2254(b)(1)(A) "requires more than a sprinkling of federal citations, and more than 'some makeshift needles in the haystack of the state court record.'" *Ramos v. Sec'y, Fla. Dep't of Corr.*, 441 F. App'x 689, 696 (11th Cir. 2011) (quoting *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir.2005)). The citation to state court cases which cited a few federal cases was insufficient to alert the state court that Petitioner was raising a federal constitutional claim with regard to the trial court's denial of his motion to dismiss, motion for new trial, and request to introduce the entirety of the recorded telephone calls. Therefore, Petitioner did not exhaust a federal claim regarding either Ground 3 or Ground 6.

Any attempt to return to state court to exhaust these claims would be futile, since the Florida procedural rules do not permit a second direct appeal. Therefore, the claims are procedurally defaulted for federal habeas purposes. Petitioner has not alleged cause for the procedural default; nor has he shown he is entitled to review of these claims through any other recognized exception to the procedural bar. Accordingly, Grounds 3 and 6 warrant no relief.

**Ground 4: The Petitioner was denied Due Process of law under the Sixth and Fourteenth Amendments of the United States Constitution when counsel asked an improper question which opened the door for the state to elicit information about the denial of the suppression of the petitioners [sic] statements made prior to his arrest which bolstered the detectives [sic] credibility and strengthened the state's case.**

Petitioner contends defense counsel was ineffective during cross-examination of Detective Schramm in asking him, "What are Miranda warnings?" The question opened the door for the State on re-direct to ask questions regarding the findings made during, and result of, Petitioner's motion to suppress. Specifically, Detective Schramm testified the court found Petitioner was not in custody during the February 28 and March 8 interviews. Petitioner argues this testimony was harmful because it bolstered Detective Schramm and Detective Morgan's testimony that Petitioner freely, voluntarily, and willingly made his statements on February 28 and March 8. He further argues had the jury not heard the testimony regarding the results of the motion to suppress hearing, there is a reasonable probability they would not have convicted him.

This claim was raised in state court in Ground 6 of Petitioner's Rule 3.850 motion (Doc. 12-3, Ex. 12, docket pp. 729-30). In denying the claim, the state post-conviction court stated:

> In claim six, Defendant alleges ineffective assistance of counsel when counsel opened the line of questioning regarding the suppression of Defendant's statements made prior to his arrest, thereby bolstering Detective Morgan's and Detective Schramm's testimony and strengthening the State's case. Specifically, he alleges counsel's line of questioning about the suppression of Defendant's statements led the jury to believe that Defendant made incriminating statements freely and voluntarily. He alleges his counsel agreed to allow the State to bring up facts litigated in a prior hearing that determined Defendant was not in custody during two interviews wherein he incriminated himself. He alleges this line of questioning led the jury to believe he freely made incriminating statements rather than was a victim of Detective Morgan's and Detective Schramm's statements and questions which

knowingly elicited incriminating responses by Defendant. He alleges had his counsel not opened this line of questioning, the jury would not have heard testimony that reinforced the State's case by giving credibility to Detective Schramm's testimony that Defendant willingly gave statements even though they did not tell him he was a suspect in the homicide. He alleges without this line of questioning, a strong probability exists that Defendant would not have been convicted.

After reviewing the allegations, the court file, and the record, the Court finds Defendant's allegations are facially sufficient. The Court finds during Mr. McKeever's cross-examination of Detective David Schramm, the following transpired:

McKEEVER: Okay. You bring him in again. You call him and he agreed to come in?

SCHRAMM: That's correct.

McKEEVER: Okay. What are Miranda warnings?

SCHRAMM: Those are rights read to a subject prior to his interview giving him his right to remain silent. It basically explains to him that he has - -does not have to speak and he has a right to an attorney at any time during the questioning and if he wants an attorney, one will be afforded to him.

SILVER: Judge, objection. Judge, if I may - - if we may approach?

(A BENCH CONFERENCE WAS HELD, AS FOLLOWS)

SILVER: Judge, right now I'd object that the defense counsel is bringing up an issue that's not a matter for this jury's consideration. Legally a court had previously entered a ruling that, by law, the defendant was not required to have his Miranda rights read, so this is misleading to the jury.

37

At this juncture, I would request the court to instruct the jury that in this case law enforcement were not, by law, required to read the defendant his Miranda rights.

McKEEVER: I'd also point out that he wasn't detained when he went there, but the state made an issue whether or not these statements were freely, voluntarily and knowingly given and I think - -

COURT: All right. Look, I see where you're going. I'll allow him to ask the question. However, this is a matter of law.

McKEEVER: I understand.

COURT: She's going to be allowed to bring up the fact that this has been litigated and determined if you're going to go there.

McKEEVER: I understand.

COURT: Okay.

McKEEVER: Thank you.

(THE BENCH CONFERENCE WAS CONCLUDED.)

McKEEVER: So you bring Mr. Keene back in again after interviewing Mr. Schaeffer and Mr. Spell, correct?

SCHRAMM: I put a call in to Mr. Keene and asked him if he'd be willing to come down and provide a statement at which time he advised he would, yes.

(*See* trial transcript, pps. 957-959, attached). Therefore, the Court finds, after the bench conference, Mr. McKeever did not resume that line of questioning. (*See* trial transcript, pps. 958-960, attached).

However, the Court finds on redirect examination, Ms. Silver inquired of Detective Schramm as follows:

38

SILVER: Sir, do you recall the defense counsel questioning you about the fact that what are Miranda rights and whether they were read to the defendant?

SCHRAMM: Correct.

SILVER: Okay. And at this time when you were speaking with Mr. Keene during the first interview, was he in custody?

SCHRAMM: He was not.

SCHRAMM: He was not.

SILVER: During the second interview, was he in custody?

SCHRAMM: He was not.

SILVER: And from a legal standpoint, did you appear before Judge Fernandez in regards to - -

McKEEVER: Judge, I'm going to object to outside of the scope.

COURT: Overruled.

SILVER: Last week, last Friday, August 19th, did you appear before Judge Fernandez out of Division F in this circuit?

SCHRAMM: I did, yes.

SILVER: Okay. And was that regarding a motion to suppress the defendant's statements?

SCHRAMM: Yes.

SILVER: And in that regard, did you become aware of whether or not the judge granted or denied that motion?

SCHRAMM: I do. He denied the motion.

39

SILVER: Or she denied that motion?

SCHRAMM: Correct.

SILVER: Okay. The court finding that the defendant was not in custody.

SCHRAMM: Correct.

SILVER: And therefore - -

McKEEVER: Objection, leading.

COURT: Overruled.

SILVER: And, therefore, you or Detective Morgan were not required, by law, to read Mr. Keene his Miranda rights.

SCHRAMM: That is correct.

SILVER: During the first interview?

SCHRAMM: Correct.

SILVER: And the second interview?

SCHRAMM: Correct.

SILVER: Judge, I have nothing further.

(*See* trial transcript, pps. 960-962, attached). Therefore, the Court finds the State did proceed with the line of questioning regarding *Miranda*.

The Court finds in response, Mr. McKeever moved for a mistrial during the following:

McKEEVER: Judge, I just need a moment, please.

COURT: Yes, sir.

McKEEVER: Judge, prior to giving my J.O.A. argument, I just want to preserve an issue for my client for - - if there's an appellate purpose. I would respectfully move for a mistrial based upon the fact that the court let the State get into the area of Miranda, credence of the court as to the credibility of the statement.

As I asked the question of what Miranda rights were, I - - there was an objection. We went up to side bar. The court instructed me if I go down that line of questioning, you were going to allow the state to respond and go through that. I stopped that line of questioning and did not continue and then this court permitted the state to elicit testimony which ultimately gives credence to a statement by Judge Fernandez in a hearing that was done outside of the presence of the jury.

So I think that would be highly - - I think that it is highly prejudicial because it does give credence to the statement. I stopped my line of questioning based upon the ruling of the court and the state then got into it.

So I would respectfully make that motion for mistrial based upon that because my client I do not believe will receive a fair trial and I think it's highly prejudicial.

COURT: State?

SILVER: Judge, the defense counsel opened the door as soon as they asked the question that Miranda rights were not read and had the detective explain what Miranda rights were. And that is misleading. Never did I question the detective in terms of Judge Fernandez's ruling? [sic]

COURT: Just a moment, counsel. Let me listen. Go head.

SILVER: Never once did I question Detective Schramm about Judge Fernandez's finding or opinion that Mr.

41

Keene's statement was not credible, merely the fact that
because he was not in custody, Miranda rights were not
read.

I understand there is the jury instruction regarding whether
the statement's voluntary. That's still applicable. The
defense can still argue that he was arrested, he was taken,
he was brought down there, it was four in the morning, all
those types of statements.

But in terms of the defense - - they opened the door to
mislead this jury into considering for that jury instruction
that Miranda rights were not read which is absolutely
contrary to the law and not permissible. So they opened - -
they should never have asked that question. They opened
the door.

COURT: Okay. Thank you. Anything else?

McKEEVER: Judge, the only additional thing is I didn't
ask if Miranda rights were read to my client. I said what
are Miranda warnings and the objection was made, so I
did not follow up on that.

COURT: Counsel?

McKEEVER: Yes, sir.

COURT: Sometimes in the dynamics of a courtroom is
what a judge sees. There's absolutely no question in my
mind of this court as you asked that question, the manner
in which it was asked going straight into Miranda,
understanding that that issue of a matter of law was
previously litigated, understanding that, you left a clear
implication through question and through follow up after
you left this bench that somehow or other this individual's
Miranda rights had been violated.

That was clearly there. It was squarely put before this jury.
And I told you - - and the follow-up questions, I think the
record will reflect, were continuing on that issue of

custody and, quote, voluntariness, and, quite frankly, the legal issue of Miranda.

You went there. And I told you and I believe that entire line of questioning left the state in a position to go ahead and make the follow-up questions they did. Now, I'll put it out there just like that. So your motion for mistrial is denied and this will be reviewed and people will make those determinations.

But I think when counsel makes that argument through questions in that manner leaving that clear implication there for the purpose, as you indicated, of later argument in front of this jury or leaving that in their minds, I think the term opened the door is quite correct. Okay. So your motion for mistrial is denied.

McKEEVER: Thank you, sir.

(*See* trial transcript, pps. 966-970, attached). Therefore, the Court finds Mr. McKeever extensively argued the issue in a motion for mistrial, but the Court denied the motion.

Moreover, the Court finds on September 2, 2011, Mr. McKeever filed "Defendant's motion for a new trial" alleging the following:

The prosecuting attorney in this case did commit misconduct in conducting a re-direct examination of Detective Schramm whereby she elicited highly prejudicial statements which incorporated the rulings and findings by the Hon. Kimberly Fernandez from the hearing on the Motion to Suppress Statements which occurred on August 19, 2011. The prosecuting attorney did make improper comments and elicit several statements which not only where [sic] improper, but statements which went to bolster the investigation by law enforcement as the Jury learned they had received approval by a Circuit Court Judge ...

(*See* Defendant's motion for a new trial, pps. 3-4, attached). The Court finds Mr. McKeever extensively argued the issue at the September 30,

2011, hearing on the motion for new trial, but the Court denied the motion for new trial. (*See* September 30, 2011, transcript, pps. 6-12, attached). Therefore, the Court finds Mr. McKeever's inquiry of Detective Schramm "[w]hat are Miranda warnings?" did not open the door for the State to inquire about the voluntariness of Defendant's statements to the detectives which were the subject of the previously litigated motion to suppress. The Court further finds Mr. McKeever objected when the State attempted to elicit testimony from Detective Schramm regarding Judge Fernandez's ruling, but the Court overruled the objection. The Court finds Mr. McKeever raised the issue in a motion for mistrial and a motion for new trial and both motions were denied. Consequently, the Court finds Defendant cannot prove that Mr. McKeever acted deficiently when Mr. McKeever did not open the line of questioning regarding the suppression of Defendant's statements made prior to his arrest, did not bolster Detective Morgan's and Detective Schramm's testimony nor strengthen the State's case, and did not agree to allow the State to bring up facts litigated in a prior hearing that determined Defendant was not in custody during two interviews wherein he incriminated himself. **As such, no relief is warranted upon claim six.**

(Doc. 12-3, Ex. 13, docket pp. 758-764) (emphasis in original).

Petitioner has failed to demonstrate he was prejudiced by defense counsel's question. Again, Petitioner contends he was prejudiced because counsel's question opened the door to Detective Schramm's testimony that led the jury to believe Petitioner's statements were given freely, voluntarily, and willingly. But none of Detective Schramm's testimony addressed whether Petitioner's statements were voluntary. Rather, the testimony addressed whether Petitioner was in custody at the time of the interviews, and the court's decision on that issue (Doc. 12-3, Ex. 4, docket pp. 250-52). The state post-conviction court therefore correctly found defense counsel's question "What are *Miranda* warnings?" did not open the door for the State

to inquire about the voluntariness of Petitioner's statements. And even if the question opened the door, there was no prejudice because Detective Schramm neither stated nor implied that Petitioner's statements were voluntary, nor that the court found the statements voluntary. Therefore, Petitioner has failed to show the state courts' rejection of this claim was contrary to, or an unreasonable application of *Strickland*, or an unreasonable determination of the facts in light of the evidence adduced in state court. Accordingly, Ground 4 warrants no relief.

**Ground 5: The Petitioner was denied Due Process of law under the Sixth and Fourteenth Amendments of the United States Constitution when counsel was constitutionally ineffective for failing to object to the state's improper comments during the suppression hearing, opening arguments and failing to motion the court for a mistrial/new trial.**

Petitioner contends defense counsel was ineffective in failing to object to statements made, and evidence presented, by the State during trial and the hearing on the motion to suppress showing Petitioner had called the victims of the attempted robbery "soft ass white boys." He further contends counsel should have moved for a mistrial. He argues the statements were irrelevant and inflammatory and shifted the burden of proof from the State to him.[5]

This claim was raised in Ground 2 of Petitioner's Rule 3.850 motion (Doc. 12-3, Ex. 12, docket pp. 719-21). In denying the claim, the state post-conviction court stated:

---

5 Petitioner does not explain how the burden of proof was shifted.

In claim two, Defendant alleges ineffective assistance of counsel due to counsel's failure to object to the State's improper comments during the suppression hearing, opening arguments, the case presentation, and closing arguments and counsel's failure to motion the Court for a mistrial. Specifically, he alleges prior to and during all phases of the trial, Assistant State Attorney Natalia Silver used Defendant's statements to inject racially inflammatory statements which had no relevance and played on the jury's emotions in a highly prejudicial manner. He alleges his counsel Mr. Dalton McKeever failed to object to the inflammatory statements and failed to make a motion for mistrial, thereby failing to preserve the issues for appeal.

He, relying on page 56 of the suppression hearing transcript, alleges during the suppression hearing, Ms. Silver asked Detective Morgan if Defendant called the victims soft white boys from Virginia. He alleges Mr. McKeever failed to object to the relevance of this inflammatory statement. He further alleges Ms. Silver made the following inflammatory statements during various phases of the trial:

> 1) During opening statements, Ms. Silver stated that Defendant referred to the victims as soft white boys. (trial transcript, pps. 239 and 241)
>
> 2) While presenting the State's case, Ms. Silver questioned Ms. Perdomo and played excerpts from jailhouse phone calls made to Defendant from Ms. Perdomo where Defendant was heard saying soft white [sic] ass white boys or soft white boys. (trial transcript, pps. 496 and 502)
>
> 3) While presenting the State's case, Ms. Silver questioned Detective Morgan while playing excerpts from Defendant's first interview after his arrest whereby Defendant said soft ass white boys. (trial transcript, p. 847)
>
> 4) During cross-examination of Defendant, Ms. Silver asked him if he told his girlfriend it was going to easy because they were soft white boys. (trial transcript, pps. 1027 and 1128)

5) During closing arguments, Ms. Silver stated Defendant referred to the victims as soft white boys. (trial transcript, pps. 1118, 1121, and 1122)

He alleges Mr. McKeever failed to object to any of the aforementioned comments based on their negative inferences towards Defendant and irrelevance. He alleges these comments prejudiced him in that they tainted and influenced the jury by shifting the burden of proof to Defendant and resulted in Defendant being convicted of a crime he may not have been convicted of had these statements been objected to during the suppression hearing and trial. He alleges there is a reasonable probability that had his counsel objected to these statements or motioned the Court for a mistrial, the result of the proceeding would have been different.

After reviewing the allegations, the court file, and the record, the Court finds "failure to preserve issues for appeal does not show the necessary prejudice under *Strickland*." *Strobridge v. State*, 1 So. 3d 1240, 1242 (Fla. 4th DCA 2009). However, because Defendant alleges had his counsel objected or made a motion for mistrial, there is a reasonable probability the result of the proceeding would have been different, the Court finds Defendant's allegations are facially sufficient. With respect to counsel's failure to object to the prosecutor's question during the August 19, 2011, motion to suppress hearing, "[d]id he call them soft white boys from Virginia?" the Court finds even if counsel had objected, it would not have changed the outcome of the motion to suppress hearing based on the other evidence presented at the motion to suppress hearing. (See August 19, 2011, transcript, August 22, 2011, order, attached). **Consequently, the Court finds Defendant cannot prove prejudice with respect to this portion of claim two.**

With respect to counsel's failure to object and make a motion for mistrial when Ms. Silver commented during opening statements that Defendant referred to the victims as soft white boys (trial transcript, pps. 239 and 241), the Court finds opening statements "are not evidence, and the purpose of opening argument is to outline what an attorney expected to be established by the evidence." *Occhicone v. State*, 570 So. 2d 902, 904 (Fla. 1990) (citing *Whitted v. State*, 362 So. 2d 668 (Fla. 1978)). The Court further finds "control of comments is within the trial court's discretion." *Occhicone*, 570 So. 2d at 904. The Court finds

the prosecutor's comments were proper as she stated what she expected to establish by the evidence.

The Court further finds during the trial, State's exhibit 17-B (one of the recorded jail calls) was admitted into evidence and played for the jury. (*See* trial transcript, pps. 489-50l, attached). The Court finds during the recorded jail call between Defendant and his girlfriend Jennifer Perdomo, Defendant makes the following comments:

> PERDOMO: I don't know what you are getting ready to do, babe.
>
> DEFENDANT: You remember when you were out. I served them fucking white boys up from Virginia. You're like, man, fucking with so many people like that. Damn, babe. They're back down and then they want - - they want four bottles cash, but fucking this - - days - - fucking serving them niggers, like a little asshole and we serve them with a snatch and grab, some **soft ass white boys** and then I'm gonna have three bottles and them shits are going for 13 a pop right now. So I'll be able to get ahead. But Jason's doing it. I'm driving.

(*See* trial transcript, p. 496, attached) (Emphasis added). Therefore, the Court finds the State presented evidence during trial that Defendant referred to the boys from Virginia as "soft ass white boys." Consequently, the Court finds Defendant cannot prove that Mr. McKeever acted deficiently in failing to make the alleged objection or motion for mistrial when the prosecutor's comments were proper comments based on what she expected to be established by the evidence and ultimately was consistent with the evidence the State presented during trial. The Court further finds Defendant cannot prove prejudice as any objection on the alleged basis would have been overruled and any motion for mistrial on the alleged basis would have been denied. **As such, no relief is warranted upon this portion of claim two.**

With respect to counsel's failure to object and make a motion for mistrial when the prosecutor inquired of Ms. Perdomo, Detective Morgan, and Defendant to gain responses that Defendant referred to the boys from Virginia as a soft white [sic] ass white boys (trial transcript, pps. 496, 502, 847, 1027, and 1128), the Court finds the

prosecutor's inquiries were proper questions aimed at eliciting and placing admissible evidence before the jury. Consequently, the Court finds Defendant cannot prove that Mr. McKeever acted deficiently in failing to make the alleged objection or motion for mistrial when the prosecutor's inquiries were proper questions aimed at eliciting and placing admissible evidence before the jury. The Court further finds Defendant cannot prove prejudice as any objection on the alleged basis would have been overruled and any motion for mistrial on the alleged basis would have been denied. **As such, no relief is warranted upon this portion of claim two.**

With respect to counsel's failure to object and make a motion for mistrial during closing arguments when Ms. Silver stated Defendant referred to the victims as soft white boys (trial transcript pps. 1118, 1121, and 1122), the Court finds Ms. Silver's comments were proper comments based on the evidence presented during the trial. Specifically, the Court finds during the recorded jail call between Defendant and his girlfriend Jennifer Perdomo, Defendant makes the following comments:

> PERDOMO: I don't know what you are getting ready to do, babe.
>
> DEFENDANT: You remember when you were out. I served them fucking white boys up from Virginia. You're like, man, fucking with so many people like that. Damn, babe. They're back down and then they want - -they want four bottles cash, but fucking this - - days - - fucking serving them niggers, like a little asshole and we serve them with a snatch and grab, some soft ass white boys and then I'm gonna have three bottles and them shits are going for 13 a pop right now. So I'll be able to get ahead. But Jason's doing it. I'm driving.

(*See* trial transcript, p. 496, attached) (Emphasis added). Therefore, the Court finds the State presented evidence during trial that Defendant referred to the boys from Virginia as "soft ass white boys." Consequently, the Court finds Defendant cannot prove that Mr. McKeever acted deficiently in failing to make the alleged objection or motion for mistrial when the prosecutor's comments were proper comments based on evidence the State presented during trial. The Court

further finds Defendant cannot prove prejudice as any objection on the alleged basis would have been overruled and any motion for mistrial on the alleged basis would have been denied. **As such, no relief is warranted upon this portion of claim two.**

(Doc. 12-3, Ex. 13, docket pp. 743-47) (emphasis in original).

The state post-conviction court concluded the evidence showing Petitioner called the boys from Virginia "soft ass white boys" was admissible (*Id.*, docket p. 746). Whether evidence is relevant and admissible are issues of state evidentiary law, and a state court's determination of state law receives deference in federal court. *See* Fla. Stat. §§ 90.402 and 90.403; *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure."). "[A] state court's interpretation of state law ... binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). *See also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (explaining "[s]tate courts are the ultimate expositors of state law," and federal courts must abide by their rulings on matters of state law) (citations and footnote omitted). "Although an ineffective assistance of counsel claim is a federal constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when 'the validity of the claim that [counsel] failed to assert is clearly a question of state law, ... we must defer to the state's construction of its own law.'" *Will v. Sec'y, Dep't of Corr.*, 278 F. App'x 902, 908 (11th Cir. 2008) (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)). *See also Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005)

("The Florida Supreme Court already has told us how the issues would have been resolved under state law had [the petitioner's counsel] done what [the petitioner] argues he should have done .... It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).

The basis for this portion of Petitioner's claim of ineffective assistance of counsel is counsel's failure to object when the State presented evidence showing Petitioner called the boys he and Jason Bahamonde intended to rob "soft ass white boys." Both the state post-conviction court in rejecting this claim and the state appellate court by affirming that rejection have answered the question of what would have happened if counsel had performed as Petitioner suggests – the objection would have been overruled. *See Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [the petitioner's counsel] objected to the introduction of [the petitioner's] statements based on [state law] — the objection would have been overruled .... Therefore, [the petitioner's counsel] was not ineffective for failing to make that objection."). The state courts' interpretation of state law is afforded deference. Therefore, Petitioner establishes neither deficient performance nor resulting prejudice from counsel's alleged error in failing to object to the evidence. *Strickland*, 466 U.S. at 691–92.

To the extent Petitioner contends counsel was ineffective in failing to object to the prosecutor's comments during both opening and closing argument that Petitioner called the boys "soft ass white boys," the state post-conviction court concluded the prosecutor's comments during opening were proper because she stated what she expected to establish by the evidence, and her comments during closing were appropriate because they were based on evidence presented during the trial (Doc. 12-3, Ex. 13, docket pp. 746-47).

During opening, the prosecutor stated there would be evidence showing Petitioner called the boys he intended to rob "soft white boys." (Doc. 12-2, Ex. 4, docket pp. 351, 353). There was nothing objectionable about the statement because it was a short, factual recitation of the evidence the prosecutor intended to introduce. *See, e.g., Occhicone v. State*, 570 So. 2d 902, 904 (Fla. 1990) ("Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence." (citation omitted)). And there was nothing objectionable about the prosecutor referencing the "soft white boys" statement during closing argument (*id.*, docket pp. 408, 411-12) because it was fair comment on evidence presented during the trial (*Id.*, docket pp. 137, 317-18). *See Merck v. State*, 975 So. 2d 1054, 1061 (Fla. 2007) (stating closing argument is an opportunity for attorneys "to review the evidence and to explicate those inferences which may be reasonably drawn from the evidence."); *United States v. Pearson*, 746

F.2d 787, 796 (11th Cir. 1984) ("the 'sole purpose of closing argument is to assist the jury in analyzing, evaluating and applying the evidence.'") (quoting *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. 1981)). Therefore, Petitioner establishes neither deficient performance nor resulting prejudice from counsel's alleged error in failing to object to the prosecutor's statements during opening and closing arguments.

Finally, Petitioner establishes neither deficient performance nor prejudice from counsel's failure to move for a mistrial. "Whether a mistrial should be granted is an issue of state law." *Samuels v. Sec'y, Dep't of Corr.*, 2020 WL 4700898, at *7 (M.D. Fla. Aug. 13, 2020). The state courts have answered the question of what would have happened if counsel had moved for a mistrial – the motion would have been denied. This Court must defer to the state courts' decision.

The prosecutor's comments during opening and closing arguments were appropriate because there was evidence presented that Petitioner had called the boys "soft ass white boys." And Petitioner's statement was relevant to the contested issue of Petitioner's intent to commit the robbery (*See* Doc. 12-3, Ex. 4, docket pp. 305, 397-98). Moreover, the statement "soft ass white boys" was not so inflammatory as to have provoked the jury or to have substantially prejudiced Petitioner's rights and affected the fairness of his trial. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding that improper comments by a prosecutor require a new trial only if they "so infected the [original] trial with unfairness as to make the resulting conviction a

denial of due process."). Consequently, the state post-conviction court did not unreasonably apply *Strickland*. *See Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994) ("In order for the prosecutor's comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.") (citation and quotations omitted). Ground 5 therefore warrants no relief.

Any claims not specifically addressed herein have been determined to be without merit.

Accordingly:

1. The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**.

2. The **Clerk** is directed to enter judgment against Petitioner and close this case.

3. This Court should grant an application for a Certificate of Appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). He cannot make this showing.[6] Accordingly, a

---

[6] Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts,

The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order, the court may

Certificate of Appealability is **DENIED** in this case. And because Petitioner is not entitled to a Certificate of Appealability, he is not entitled to proceed on appeal *in forma pauperis*.

      **ORDERED** in Tampa, Florida on September 21, 2021.

Charlene Edwards Honeywell
Charlene Edwards Honeywell
United States District Judge

Copies to:
Petitioner, *pro se*
Counsel of Record

---

direct the parties to submit arguments on whether a certificate should issue. . . . If the court denies a certificate, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22. A motion to reconsider a denial does not extend the time to appeal.